**Wendee HENRICKSEN,
Plaintiff-Appellant,**

v.

**George HENRICKSEN and Smith
Barney, Harris, Upham & Co.,
Inc., Defendants-Appellees.**

**Nos. 80–1488, 80–1584.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1980.

Decided Feb. 6, 1981.

Rehearing and Rehearing En Banc Denied
March 30, 1981.

---

est and costs for conversion and fraudulent mismanagement of Wendee's account at Smith Barney. The court further found George and Smith Barney jointly and severally liable in the amount of $21,754.65 plus interest for commissions and margin expenses generated during George's mismanagement of the account. Wendee appeals from that portion of the judgment denying recovery against Smith Barney for the $88,-921.22 plus interest and costs she lost through George's unlawful conduct. Smith Barney cross-appeals from the $21,754.65 judgment against it. We conclude that the district court erred in not finding Smith Barney liable for the total damages Wendee suffered and therefore reverse in part and affirm in part.

## I

George and Wendee were married in August 1969. In 1970, the couple moved to Milwaukee, Wisconsin, where George went to work as a stockbroker at Smith Barney.[1] Wendee was employed as a third grade schoolteacher, but left teaching in 1973 when the couple's daughter was born.

At George's request, Wendee opened three discretionary accounts at Smith Barney—a regular account, an option account and a margin account—in June 1972, November 1975 and January 1976 respectively. A discretionary account is one in which the broker—in this case, the client's husband— is given discretion to conduct transactions without the client's prior approval. Accordingly, Wendee executed two powers of attorney, in June 1972 and November 1975 respectively, giving George complete discretion over the management of her Smith Barney accounts. According to the testimony at trial, Wendee had no interest in the details of her financial matters, did not understand the nature of option or margin trading, and never read any of the documents George gave her to sign in connection with the accounts.

Bruce C. O'Neill, Milwaukee, Wis., for plaintiff-appellant.

W. Stuart Parsons, Quarles & Brady, Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*

CUMMINGS, Circuit Judge.

Plaintiff Wendee Henricksen (Wendee) brought this securities fraud action against her former husband, George Henricksen (George), a registered stockbroker, and his former employer, the investment firm of Smith Barney, Harris, Upham & Co., Inc. (Smith Barney). After a bench trial, the district court found George liable to Wendee in the amount of $88,921.22 plus inter-

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

1. Smith Barney & Co., Inc. merged with Harris, Upham & Co. in February 1976.

A new account form filled out in June 1972 in accordance with the New York Stock Exchange "Know Your Customer" Rule listed Wendee's investment objective as "long-term growth of capital—income secondary," the second most conservative investment objective listed on the form.[2] As required by Smith Barney's internal rules, an option client information sheet and an option client approval sheet were prepared in connection with the opening of Wendee's option account. The option client information sheet, prepared and signed by George, indicated that Wendee's investment objective was "growth" as opposed to "income" or "speculation" and that the only type of option transaction anticipated was "covered writing."[3] The option client approval sheet, signed by the branch manager of Smith Barney's Milwaukee office, a registered options principal, and a member of Smith Barney's New York compliance section, stated that Wendee's was a discretionary account and that it was "Approved for covered writing transactions only" (Tr. 284). The option client information sheet prepared by George also indicated that Wendee's option account was a single, not a joint, account; that the client was a 28-year-old housewife with an annual income of $5,000 or less, a net worth of "100,000–250,000" and net assets of $123,000; and that her husband's annual income was $30,000.

The Smith Barney Compliance Manual provided that each order in a discretionary account had to be approved by the branch manager prior to the entry of the order, that the New York compliance section had to make a daily and monthly review of all discretionary account transactions, and that such approvals and reviews were to be made in light of the client's investment objectives. The Compliance Manual also provided that option transactions were to be approved only for clients having at least a $20,000 annual income and $20,000 of

investment assets and then only for the categories of option trading approved on the option client approval sheet.

With the exception of one transaction not relevant here, Wendee's accounts were inactive until January 1976. In that month, Wendee received a distribution from a family trust and deposited it in her regular account at Smith Barney. The distribution consisted of 822 non-saleable voting certificate shares in Badger Meter Company, "blue-chip" securities with a market value of $97,814, and $8,000 in cash, which was immediately used to purchase another "blue-chip" stock. The value of Wendee's portfolio in January 1976, including some stock already in the account and not including the Badger Meter voting certificates, was $105,814. Wendee had an express agreement with George that her capital was to be preserved and ultimately used for the education and life needs of the couple's daughter.

In February 1976, George arranged to have the address on Wendee's accounts changed from the couple's home to Smith Barney. Thereafter, all monthly statements, confirmation slips and checks issued out of the account were received by George at his office. Smith Barney's Compliance Manual required that a client's change of address should be "carefully reviewed" and that a letter confirming the requested change of address should be mailed to the client at the old address. Although Smith Barney had no record of a written change of address request on the accounts, Milwaukee Branch Manager Richard Vermillion testified that it was his belief that George had filed such a written change of address request. No letter confirming the requested change was ever sent by Smith Barney to Wendee at her home address.

---

**2.** The choices on the form were: "Conservation of capital with stable income," "Long-term growth of capital—income secondary," "Moderate capital appreciation with reasonable income," "Short-term trading profits," and "Speculative capital gains" (Exhibit 17, Tr. 137).

**3.** The forms of option trading not anticipated or approved for the account were: unsolicited transactions, purchasing calls, spreading, uncovered writing, and discretionary transactions (Exhibit 19, Tr. 205).

In October 1976, George and Wendee separated because of marital problems due apparently in part to George's involvement with a group of friends who engaged in gambling and heavy drinking. Although the couple initially hoped to reconcile, Wendee filed a divorce action in the spring of 1977. They were divorced in 1978.

Despite George's problems and their marital difficulties, Wendee left her investment arrangement unchanged because she retained "100% faith" in George as her broker; because the account was supervised by other Smith Barney personnel, including Branch Manager Richard Vermillion, a personal friend of Wendee's parents; and because she believed that having her investments at Smith Barney was "like having money in a bank." Vermillion and his successor Leonard Walsh, testified that they were aware of George's marital problems and of his gambling activities.[4] Vermillion on several occasions in 1976 spoke with George about his gambling and told him to stop it. Vermillion also testified that he knew Wendee relied totally on George to manage her accounts. Both Vermillion and Walsh knew that Wendee was not receiving any written information on the accounts from Smith Barney after January 1976.

Starting in February 1976, after the change of address on the account and before their separation, George began to sell off Wendee's "blue-chip" securities. Between then and October 1977, George ordered 17 Smith Barney checks totalling $54,798.57, derived from the sales and payable to Wendee, to be drawn on Wendee's Smith Barney account but delivered to him. Another Smith Barney check for $558.40 was issued on January 20, 1976, before the address on the account was changed, bringing the total to $55,356.91. Wendee never knew of the sales transactions nor saw any of the checks, although a facsimile of her signature appeared on each of them. Checks totalling $43,825.57 were deposited in the couple's joint savings account and

within a few days of each deposit an amount approximately equal to the deposit was withdrawn by George. The remaining converted $11,531.34 did not pass through the savings account. Wendee testified that she did not know that the joint savings account was still in existence.

Smith Barney's internal rules prohibit any stockbroker from receiving a check for delivery to a client unless the branch manager approves the delivery and makes a written record of the circumstances requiring delivery to the stockbroker. No such written records were produced at trial, but Vermillion and Walsh testified that between them they had approved all 17 checks delivered to George. Vermillion testified that George had told him that he was liquidating Wendee's securities because he did not like the market and that it was more convenient for him to receive the checks at the office as they were to be deposited in a bank in the same building as the Smith Barney office. Walsh testified that he never asked, and George never told him, why George was withdrawing the cash.

During the same period of time, George activated Wendee's option and margin accounts. Between July 1976 and February 1977, the outstanding loan balance in the margin account ranged from a high of $71,180 in August of 1976 to a low of $45,480 in October 1976, and in February 1977 stood at $60,280. In that month, George began purchasing calls, a form of option trading which the district court found was inconsistent with the option client approval sheet on Wendee's account and unsuitable in terms of Wendee's recorded investment objectives. How these transactions were approved by Smith Barney's branch manager and the New York compliance section will be discussed in detail in Part II. As a result of the call purchases, Wendee's account lost $33,564.31. The trading activity in the accounts also generated $21,754.65 in commissions and margin interest. Consequently, by the end of October 1977 noth-

4. Wendee argues on appeal that the district court erred in excluding from evidence the fact that Leonard Walsh placed a bet or bets through George and George's bookie. In view of our disposition of the case, we find it unnecessary to dicuss this alleged error.

ing remained in Wendee's portfolio except the 822 nonsaleable shares of Badger Meter Company.

Throughout this time, George was furnishing Wendee with periodic account summaries fraudulently indicating an equity above $100,000. George also completed, in connection with the divorce proceedings in the spring of 1977, a financial declaration fraudulently stating the value of Wendee's securities to be $114,000. Wendee did not suspect that there might be anything wrong with her accounts until January 1978 when she learned that George had re-mortgaged their house. Leonard Walsh, the branch manager who had responsibility for supervising Wendee's accounts throughout 1977, did not learn that the accounts had been depleted until March 1978 when this lawsuit was commenced.

Wendee's complaint stated eight claims and alternative claims based on provisions of the federal securities laws, state common law and the rules of the New York Stock Exchange and the National Securities Dealers Association. At the trial George invoked his Fifth Amendment rights and declined to answer any questions concerning his alleged wrongdoing.

The district court found that George had unlawfully converted to his personal use $55,356.91 of Wendee's account funds in violation of state common law, Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j) and the Securities and Exchange Commission Rule 10b–5 (17 C.F.R. § 240.10b–5). He also found that George's purchase of calls was a part of a scheme to offset and conceal his conversion and that taken as a whole George's activities constituted a scheme to defraud his client in violation of his fiduciary duty, Section 10(b) and Rule 10b–5. He therefore held George liable for the $33,564.31 loss resulting from the call purchases, thus far totalling a recovery of $88,921.22 for Wendee. Finally George was held liable for $21,754.65 for commissions and margin account interest. Those rulings are not challenged in this appeal.

Wendee also sought damages against Smith Barney alleging liability under the common law doctrine of *respondeat superior* and under Section 20(a) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78t(a)). The district court denied recovery of the $88,921.22 trading losses and monies converted under either theory but found Smith Barney jointly and severally liable with George for the $21,754.65 in commissions and margin expense (plus interest) on the reasoning that Smith Barney would be unjustly enriched if permitted to profit from George's misconduct. Wendee's appeal and Smith Barney's cross-appeal followed.

II

■ Section 20(a) of the Securities and Exchange Act of 1934 provides in pertinent part:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

In *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1051 (7th Cir. 1974), this Court held that a broker-dealer would be liable for its employee's acts under Section 20(a) if it "did not maintain a reasonably adequate system of internal supervision and control over the [registered representative] or did not enforce with any reasonable diligence such system * * *." Wendee's contention is that Smith Barney failed to enforce its internal compliance rules with reasonable diligence and is therefore liable under Section 20(a) for all the damages she suffered as a result of George's unlawful acts.

The district court found first that George's unlawful conversion of $55,356.91 of Wendee's account funds could not have been prevented by Smith Barney's reasonably diligent enforcement of its internal

rules because Wendee would not have discovered the thefts even if the address on the account had been changed since by her own admission she did not concern herself with correspondence from Smith Barney and since the first converted check had in fact gone to the couple's home. The court also found that even if the change of address had facilitated George's misconduct, Smith Barney had not been guilty of an unreasonable lack of diligence with respect to the change of address or the approval of the cash withdrawals delivered to George because Rule 409(b)(2) of the New York Stock Exchange expressly permits a registered representative to receive his wife's checks on accounts over which he holds a power of attorney and because Branch Managers Vermillion and Walsh received plausible explanations for both the change of address and the cash withdrawals. Finally, the district court found that Smith Barney was not guilty of unreasonable diligence in supervising the quality of trading in Wendee's accounts.

We think the record shows plainly that Smith Barney in fact did not properly follow its own compliance rules with respect either to the change of address request or to the checks delivered to George, but we nevertheless agree with the district court for the reasons it gave that the technical lack of compliance in these matters standing alone would not have constituted a violation of Section 20(a). We cannot agree, however, that Smith Barney was reasonably diligent in its supervision of the trading in Wendee's account, and we further conclude that this lack of reasonable diligence in combination with the generally casual supervision of George's activities contributed not only to the trading losses and commission and margin expenses but to the conversions as well.

As noted, each transaction in Wendee's account should have been approved by the Milwaukee branch manager prior to entry and reviewed by the compliance section in New York. However, of the 40 ticket orders produced by Smith Barney at trial for Wendee's accounts in 1976, four were approved by someone other than the branch manager and 13 were not approved by anyone. Moreover, as the district court found, call purchases were not authorized for Wendee's account. Although George Howard, a compliance officer in New York, testified to the effect that the account "must have" been approved for call purchases because otherwise the computer would have flagged the orders, no written record was produced to contradict the original option client approval sheet authorizing only covered writings. Vermillion, Walsh and Howard each conceded that call purchases were, as the district court found, unsuitable for an account with stated investment objectives of "long-term growth" and "growth," but stated their belief that Wendee's recorded objectives were superseded when she executed the option and margin account agreements because a client who enters such an agreement automatically becomes a speculator. Smith Barney's Compliance Manual does not so provide, however, and Vermillion and Walsh admitted that there was no Smith Barney policy of communicating such a consequence to clients at the time they execute either an option or margin account agreement.

In addition, Smith Barney's internal rules, as noted, prohibit option trading for investors having less than $20,000 in investment assets and a $20,000 annual income. Wendee, whose annual income was less than $5,000 annually, was therefore not a qualified options investor. Her account was nevertheless approved for option trading on the strength of George's $30,000 annual income despite the facts that the compliance rules do not authorize consideration of a spouse's income on a single account, that George had his own option trading account, and that Vermillion, Walsh and Howard thought it unnecessary to review the activity in the two option accounts (supported by one salary) in conjunction with one another. An expert witness testified that a spouse's income is irrelevant to an investor's suitability for option trading under the "20–20" rule unless the account is jointly held.

Finally, Smith Barney requires, in addition to daily and monthly reviews for discretionary accounts, that any account generating five or more trades in one month be reviewed for excessive activity or "churning" by the compliance section, the branch manager and the broker on the account. After four months of reported excessive activity in a 12-month period, a comprehensive six-month review of profits, losses and commissions by the branch manager is required and a direct consultation with the client recommended. Excessive activity reports should have issued for Wendee's account in January, February and July 1976, but did not issue because, according to the testimony of Compliance Officer Howard, the computer in New York had not yet been fully programmed following Smith Barney's merger with Harris, Upham & Co. in February 1976. New York did issue excessive activity reports for October and December 1976, but these reports were not reviewed as required by the Milwaukee office, apparently because of some disruption in procedure when Leonard Walsh replaced Richard Vermillion as branch manager.

Had excessive activity reports issued in accordance with Smith Barney procedure, a 6-month review would have been required on the account after the October 1976 report. As it turned out, it was not until the account was flagged by the computer for excessive activity (18 trades) in January 1977 that Compliance Officer Howard requested Leonard Walsh to obtain from George a review of Wendee's account. George did not complete the requested review until March 8, 1977, and his report misrepresented the equity in Wendee's account at $110,000. Walsh did not detect the misrepresentation because, according to his testimony, he was interested only in the profits and losses and not the equity figures.

When the account was flagged again in February 1977 (20 trades), Howard requested Walsh to obtain from Wendee, as the Compliance Manual required, a letter stating that the trading activity in her account was in accord with her investment objectives. Walsh told Howard that such a letter was unnecessary because he had just had dinner with Wendee, and Howard agreed to waive the need for written approval. Walsh testified, however, that in fact the dinner had been a social visit and that he had never discussed Wendee's account with her on that or any other occasion.

When the account was again flagged for excessive activity (24 trades) in May 1977, Walsh had an office worker prepare a six-month profit and loss analysis on the account. The resulting report was, by Walsh's admission, erroneously prepared and as a consequence showed $100,000 of equity, $14,926.29 in profits and $12,500 in commissions when it should have shown $55,916.85 of equity and a $294.57 loss for the period before commissions of $12,500. As a result of this sequence of omitted and erroneous reports, Leonard Walsh had no idea what had happened to Wendee's account until this lawsuit was commenced.

The foregoing summary of the record clearly establishes a lack of reasonably diligent enforcement of internal supervisory rules. However, the district court reached the conclusion that Smith Barney was not liable under Section 20(a) on the ground that Smith Barney's supervisory personnel were entitled to rely on George's investment decisions because Wendee had given him broad discretionary power over the accounts. This view is based on a misunderstanding of the fiduciary relationship between George and Wendee. Wendee opened discretionary accounts at Smith Barney giving George, as her broker and as Smith Barney's representative, discretionary powers over her accounts. In short, Wendee's agent in the management of her accounts was Smith Barney as represented by their agent George Henricksen. By accepting Wendee's discretionary accounts, Smith Barney took upon itself a far more stringent fiduciary responsibility than it undertakes with respect to nondiscretionary accounts in which the client retains control over the management of his investments. See, e. g., *Kravitz v. Pressman, Frohlich & Frost, Inc.,* 447 F.Supp. 203, 213 (D.Mass.

1978). Smith Barney recognizes this greater obligation in its compliance rules by requiring supervisory approval of discretionary transactions on a daily basis as well as monthly reviews. The fact that Wendee and George were husband and wife did not in any way relieve Smith Barney of its duty of supervision over Wendee's accounts. Indeed, if anything, it increased that duty because, as Smith Barney's internal rules also provide, employee-related accounts, whether discretionary or not, are subject to greater scrutiny than non-employee-related accounts. Smith Barney failed to follow its own compliance rules and procedures for supervising discretionary accounts, and it cannot now claim in defense that it relied on the discretionary judgment of the very person it was supposed to be supervising to justify the lack of supervision.

Had Wendee's account been properly supervised, it would have been subject to a full review in November 1976, following the fourth excessive activity month in a 12-month period. The computer programming delay and the turnover in personnel in the Milwaukee office do not excuse the absence of required supervision in this period. It cannot be known with certainty that George's conversion of withdrawals would have been deterred or detected and stopped by such a review. However, there can be no doubt that Smith Barney's failure to enforce its supervisory procedures violated Section 20(a) and that it contributed not only to George's unauthorized option trading but also to the ease with which he withdrew and converted the proceeds from the sale of Wendee's "blue-chip" stocks. Consequently, we hold that Smith Barney is liable to Wendee under Section 20(a) for the $33,564.31 lost through the unauthorized purchase of calls, the $21,754.65 in commissions and margin expenses, and the monies lost through conversion between November 1976, when the first full review of her Smith Barney account should have been conducted, and the end of October 1977 when that account reached zero, plus prejudgment interest and costs.

## III

■ Wendee also charged Smith Barney with liability for the unlawful acts of its agent, George, under the common law doctrine of *respondeat superior.* This claim is independent of, and the potential liability broader than, that under Section 20(a). See *Fey v. Walston, supra,* 493 F.2d at 1052–1053; see also *Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir. 1980); *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111 (5th Cir. 1980). As we stated in *Fey, supra,* 493 F.2d at 1052 n. 19:

> "[U]nder common law principles, a principal is liable for the deceit of its agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal."

The district court acknowledged that "normally" Smith Barney would be liable for all the damages resulting from George's fraudulent acts, but held that Wendee's claim was barred here because George was acting as her agent as well as Smith Barney's agent and Wendee was in a better position than Smith Barney to detect and prevent George's fraud. The court then went on to hold that Smith Barney was nevertheless liable for the $21,754.65 in commissions and margin expenses because, notwithstanding Wendee's greater ability to prevent the wrong, Smith Barney should not be permitted to profit as a result of wrongs committed by its agent.

These findings also turn on the erroneous understanding discussed above of the fiduciary relationships among George, Wendee and Smith Barney. Wendee's opening of discretionary accounts at Smith Barney did not create a classic "dual agency" situation. George was not acting nor was he authorized to act as Wendee's agent independent of his position as a stockbroker employed by Smith Barney. As we have already stated, the primary agency relationship created by the discretionary accounts was between Wendee and Smith Barney, with George acting on Smith Barney's behalf.

Having entrusted her investments to Smith Barney's management through George, their agent, Wendee was entitled to rely on Smith Barney's fiduciary obligation to manage the investments in accordance with her recorded investment objectives and George's best professional judgment subject to the review and ultimate control of Smith Barney's supervisory personnel. It is true, of course, as Smith Barney argues, that had Wendee not authorized discretionary accounts or had she herself supervised George's investment decisions, she might have discovered and prevented the fraud. But Wendee had no obligation to supervise George. She received periodic reports from George indicating an equity in her account of over $100,000 and at the time of the divorce action in the spring of 1977 was provided with a financial declaration stating the equity to be $114,000. She was entitled to rely on George's representations of the status of her account and to assume therefrom that the account was being properly managed by George and Smith Barney. Indeed, the whole point of a client's establishing a discretionary account is to turn over to the investment firm management and investment responsibilities that the client either does not want to have or feels inadequate to handle.

Broker-dealers do not have to accept discretionary accounts. Harris, Upham & Co., for example, had a policy against accepting such accounts before its merger with Smith Barney. But having accepted Wendee's trust and the concomitant fiduciary burdens, Smith Barney cannot now disclaim liability by arguing that Wendee should not have been so trusting. Accordingly, we hold that Smith Barney is liable to Wendee jointly and severally with its agent George Henricksen under state common law not only for the damages discussed above for which Smith Barney is independently liable under Section 20(a) but in addition for the monies converted by George in the course of his management of the fund prior to November 1976 and Smith Barney's violation of Section 20(a).

For the reasons stated, the judgment of the district court is reversed to the extent that it denied plaintiff recovery from Smith Barney for the sum of $88,921.22, plus prejudgment interest on that sum computed at the rate of 5% per annum since November 1, 1977, plus costs, and in all other respects is affirmed. Costs on appeal are taxable to Smith Barney.