Brian **MONIESON**, Petitioner,

v.

**COMMODITY FUTURES TRADING COMMISSION**, Respondent.

No. 92–3014.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1993.

Decided June 7, 1993.

**854**

Jerrold E. Salzman (argued), Phillip L. Stern, Freeman, Freeman & Salzman, Chicago, IL, for petitioner.

Jay L. Witkin, Jay L. Witkin, Kathleen McDonough, Jeffrey S. Holik (argued), John Nolan, Dennis Klejna, Joanne T. Medero, Commodity Futures Trading Com'n, Office of Gen. Counsel, Washington, DC, Dennis M. Robb, Rosemary Hollinger, Commodity Futures Trading Com'n, Chicago, IL, for respondent.

Before CUMMINGS and MANION, Circuit Judges, and RONEY, Senior Circuit Judge.*

CUMMINGS, Circuit Judge.

Brian Monieson was a major figure in the commodity futures industry. As chairman of the Chicago Mercantile Exchange from 1983 to 1985 and founder, chairman of the board, and majority stockholder of GNP Commodities, a sizeable futures commission merchant, he wielded great influence and shouldered tremendous responsibility. In 1988 the Commodity Futures Trading Commission (CFTC) issued a complaint against Monieson, GNP, and two associated persons of GNP, Norman Furlett and Ira Greenspon. The latter two were charged with, among other things, fraudulently allocating customer trades in violation of Section 4b(A) of the Commodity Exchange Act (CEA). 7 U.S.C. § 6b(A). The complaint also charged GNP with derivative liability for Furlett and Greenspon's activity under 7 U.S.C. § 2, as well as recordkeeping violations, non-competitive trading, and a failure to supervise the traders under Commission Rule 166.3. 17 C.F.R. § 166.3. Most important for this case, the complaint charged Monieson with liability as a "controlling person" of Furlett and Greenspon under Section 13(b) of the CEA, 7 U.S.C. § 13c(b), and with failure to supervise under Rule 166.3.

After a hearing an Administrative Law Judge (ALJ) found all of the defendants guilty on all charges, imposing penalties and fines on each. The judge revoked Monieson's registration as a floor broker, permanently banned him from trading on any contract market, and levied a civil monetary penalty of $500,000 against him. The CFTC affirmed on appeal, though it reduced Monieson's lifetime trading ban to two years. Monieson now appeals,[1] contesting both his liability and the sanctions.

## I. BACKGROUND

### A. *Facts*

The first task in this complicated case is to define the cast of characters. First, of course, is Monieson, who founded GNP in 1973. At the time of the activity under scrutiny he owned a majority of the company's stock and served as chairman of the board. He was also regularly involved in the daily operation of GNP. For example, he made the decisions to hire both Furlett and

---

* The Honorable Paul H. Roney, Senior Circuit Judge of the Eleventh Circuit, is sitting by designation.

1. GNP originally joined Monieson in this appeal, but has since voluntarily withdrawn pursuant to Fed.R.App.P. 42(b).

Greenspon, he approved the arrangements for Furlett's profits and expenses with GNP, and he resolved commission disputes between Furlett and other traders. The president and vice president of GNP frequently reported to Monieson regarding day-to-day operations of the firm.

Next come Furlett and Greenspon. In 1983 GNP established a retail sales division, and Monieson hired Norman Furlett, a long-time friend, to head the division. Monieson hired Greenspon for the retail division in 1985. Both Furlett and Greenspon maintained personal trading accounts at GNP, as well as trading in a joint account and, of course, trading on behalf of customers.

At the same time it established the retail division, GNP established a compliance department to insure that the company and its employees abided by applicable rules. James Schlifke, an attorney, served as part-time compliance counsel in 1983 and 1984, became full-time in 1985, and in 1986 became GNP's general counsel.

Kathryn Haun, a veteran GNP employee, became part of the compliance department in 1985. Haun established compliance procedures for GNP brokers and reviewed daily trading activity. She also assembled a chart depicting the results of her investigation of trades made by Furlett and Greenspon between February 3–14, 1986.

Closest to Monieson in the GNP structure were Fred Arditti and Donald Breitfelder. Arditti became president of GNP in early 1985. Breitfelder was GNP's executive vice president from 1981 to March 1986. At all relevant times the compliance department reported to either Breitfelder or Arditti, who in turn reported to Monieson.

Other individuals important to this case are Roger Walter, Furlett's personal clerk; Barbara Fiore, one of Greenspon's clerks; and Paul Gelman, a trader at GNP who told Monieson of his suspicions concerning Furlett's trading.

We now move to a brief summary of the facts, as found by the ALJ and adopted by the Commission.[2] Since Monieson is the only appellant in this case, this opinion concentrates on the facts and testimony most relevant to the charges against him.

In January 1986 Furlett's clerk, Roger Walter, told general counsel Schlifke that both Furlett and Greenspon were placing orders to the trading floor without account numbers and later allocating winning trades to their own accounts and losing trades to customer accounts. In traders' parlance, that practice is known as "bucketing" trades. In February Greenspon's former clerk, Barbara Fiore, also told Schlifke that the traders were bucketing trades. Later that month Schlifke told Monieson about his conversations with Walter and Fiore, but Monieson concluded that those two were not very reputable; Fiore had been fired and Walter had been convicted of a felony in 1982, and therefore Monieson did not act on the allegations.

GNP president Arditti was aware of the problem with Furlett and Greenspon both from what Schlifke had told him and from Kathryn Haun of the compliance department, who told him that she suspected illegal trading. Haun said that she had already told Monieson about her suspicions, but he was not convinced. When Arditti discussed Haun's allegations with Monieson, the latter said that they were probably caused by a commission dispute between Haun and Furlett, and that he should stay out of it. This was similar to what had happened in January when Paul Gelman, another trader involved in a commission dispute with Furlett, told Monieson that he thought Furlett and Greenspon were bucketing trades. Believing that Gelman, who had no hard evidence of misconduct, was simply trying to gain leverage in his commission dispute, Monieson disregarded the charges.

Later in February, Schlifke and Arditti discussed the possible problems in Furlett's

---

2. We review the ALJ's findings of fact with extra scrutiny in this case because of the judge's near-wholesale adoption of the CFTC Division of Enforcement's proposed findings of fact. See *Gimbel v. CFTC,* 872 F.2d 196 (7th Cir.1989). *Gimbel* vigorously discouraged ALJs from uncritically accepting the Division's version of things, due to the appearance of a lack of diligence. Our more searching review does not change the outcome, however, because the factual findings are supported by the record.

and Greenspon's accounts and decided to investigate further. Arditti had Haun compile a chart comparing trades in Furlett's and Greenspon's accounts with customer accounts trading in the same commodities at the same time. The chart covered ten days of trading (February 3–14) and revealed that on four of those days one or more of Furlett's and Greenspon's personal accounts made money, while their customers trading the same commodities lost money. Schlifke, Arditti, and Monieson reviewed the chart together. Monieson believed that the evidence was not conclusive and did not warrant dismissing the traders. Arditti agreed, though he asked Schlifke and Haun to continue to monitor the accounts.[3] Schlifke, on the other hand, told Monieson that he thought that "it looked bad, and that the firm had liability, and that he should let Furlett and Greenspon go."[4] Tr. 602.

In May 1986 Furlett's clerk, Roger Walter, testified about Furlett's trading before the Chicago Mercantile Exchange. Afterward, Monieson called Walter into his office and asked if Furlett and Greenspon had been stealing. Walter said yes. Monieson then asked if they were still stealing, and Walter answered no. Monieson testified that he told Walter, "You've got to tell the truth, but you're playing with people's lives and you have to be very careful what you say." Tr. 768. Walter, however, remembered Monieson adding another, more ominous sentiment: "I'm not telling you to lie, but it's okay to say you don't remember." Tr. 139.

Despite his dismissal of the numerous allegations, Monieson acknowledged that he knew there was a real problem with Furlett and Greenspon in May. He reacted, however, not by ordering any further investigation or taking action against the two traders, but by "[trying] to let that play out and disasso-

ciate myself from a very, very close person [Furlett]." Tr. 769. He did so based on assurances—presumably Walter's statement, or from Furlett himself, who spoke with Monieson after Walter left the office—that the stealing had stopped. Tr. 768. Monieson allowed the two traders to stay at the firm until October 1986. At that time they left GNP and, with the help of Monieson's attorney, started a new introducing brokerage called Comwest, which was guaranteed by GNP.

## B. *Prior Proceedings*

### 1. The ALJ's Initial Decision

The case was presented to the ALJ during a two-week hearing in November of 1989. As relevant to this appeal, the CFTC alleged that: (1) At various times between September 1984 and May 1986, Furlett placed orders to the floor at the Chicago Board of Trade and the Chicago Mercantile Exchange without proper account identification, and later fraudulently allocated the trades by placing losing trades in customer accounts and winning trades in personal accounts or the accounts of friends; (2) Between January and May 1986, Greenspon also placed orders without proper account identification and fraudulently allocated losing trades to customer accounts and winning trades to personal accounts or the accounts of friends; (3) Monieson was a controlling person of Furlett and Greenspon and did not act in good faith to prevent their violations, meaning he was liable to the same extent as the two traders; and (4) Monieson failed to supervise Furlett and Greenspon diligently.

After hearing testimony from several GNP employees regarding Furlett and Greenspon's placement of orders and allocation of trades, and after reviewing records of their

**3.** Arditti could not remember whether he told Monieson of his intention to keep an eye on Furlett and Greenspon's accounts. Tr. 444.

**4.** Monieson disputes that Schlifke recommended firing Furlett and Greenspon in February 1986. He contends that Schlifke did not make the quoted remark until October 1986, immediately after a discussion with a CFTC investigator. That contention lacks support. Although the transcript is unclear on the exact date of the state-

ment, it is plain that Schlifke was reacting to the results of Haun's investigation, and that he remembered Monieson's response to the data. Tr. 602 ("I didn't think it [Haun's chart] was necessarily conclusive, but I thought it was strong enough to warrant their dismissal. [Monieson] did not."). From these comments it appears that Schlifke told Monieson of his concerns sometime soon after Haun completed the chart in February, not in October.

trading activity, the ALJ concluded that there was "conclusive evidence that they placed trades without account identification" and that "Greenspon and Furlett were allocating these trades, and thereby defrauding their customers." *In the Matter of GNP Commodities, Inc.,* [1990–92 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,857, at 37,-072 (Initial Decision, May 25, 1990). As the ALJ explained,

> The allocation occurred when Greenspon or Furlett would receive a fill on an order that had been placed without proper account identification. If the fill turned out to be one that was profitable, it often would be placed in one of Greenspon's or Furlett's accounts or in an account of one of their friends. If the fill turned out to be unprofitable, it often would be placed in the account of a customer.

*Id.* The ALJ rejected the traders' argument that no fraud could have occurred because all of the trades were authorized by customers. Fraud could occur even with authorized trades, the ALJ reasoned, because even though the customer received a fill for the order, the fill may not have come from the trade he requested, but rather may have been switched with a more profitable fill that Furlett or Greenspon misappropriated for themselves.

Next the ALJ discussed Monieson's liability as a controlling person under Section 13(b) of the Commodities Exchange Act. 7 U.S.C. § 13c(b). Based on testimony from Schlifke, Arditti, Gelman, Walter, and Woods (a GNP clerk) that they believed that Furlett and Greenspon were placing orders without proper account identification, and that Monieson had known of this and done nothing to stop it, the ALJ found that Monieson had acted in bad faith and was therefore liable. *Id.* at 37,073–74.

The ALJ relied on the same testimony to find that Monieson had not fulfilled his duty to supervise Furlett and Greenspon diligently as required by CFTC Rule 166.3. Monieson argued that he did not have supervisory responsibility because he was chairman of the board and was only responsible for setting general firm policy, but the ALJ disagreed. Rather, the judge credited the testimony of Arditti, Schlifke, and Breitfelder that Monieson was an active participant in the daily operation of GNP, and that they often sought his approval of routine decisions.

Having found liability, the ALJ proceeded to impose sanctions. Finding the violations to be extremely serious, the judge revoked Monieson's registration as a floor broker and banned him from all future trading, stating that "he is hereafter prohibited from trading on or subject to the rules of any contract market." *Id.* at 37,079. The ALJ also ordered Monieson to cease and desist from further violations of the CEA and to pay a civil penalty of $500,000—the same fine imposed on GNP itself.

## 2. CFTC Decision

On appeal the CFTC affirmed the ALJ's conclusion that Furlett and Greenspon had bucketed trades. The Commission held that the Division of Enforcement had made a prima facie case and that Furlett and Greenspon had not met their burden of producing an exculpatory explanation for their conduct. It also had "no doubt" that Monieson was a controlling person of Furlett and Greenspon, and agreed with the ALJ that he had acted in bad faith by ignoring warnings from several employees regarding the misallocation of trades. On the question of supervisory liability, the CFTC held that Monieson exercised close control of GNP: the president and vice president reported directly to him, he settled commission disputes, and he made decisions regarding expenses for traders and the limits for certain kinds of trading. Once it concluded that Monieson had supervisory duties, the CFTC had no question that he had failed to supervise the traders diligently.

Reviewing the sanctions, the CFTC began by noting that Monieson was presumptively unfit for registration because, under Section 13(b), he was liable to the same extent as Furlett and Greenspon, who were clearly unfit for registration. Since Monieson did not rebut the presumption with evidence of mitigation or rehabilitation, the Commission concluded that he was properly removed from his position of public trust. *In the Matter of GNP Commodities, Inc.,* [1990–92

Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,360 at 39,221 (CFTC August 11, 1992).

Next came the trading prohibition, which is appropriate only where "a nexus exists between respondent's violations and the integrity of the futures market." *Id.* at 39,222. Because the violations here were trading-related and involved proprietary house and customer accounts, the Commission found that some sanction was in order. Yet, since lifetime trading bans are rarely appropriate, it reduced the prohibition to two years.

Finally, the Commission held that the $500,000 fines imposed on both GNP and Monieson were appropriate because the violations were "intentional and egregious" and because penalties must be sufficient to vindicate the important public policies underlying the CEA and CFTC rules. *Id.* at 39,223. It also upheld the cease and desist order.

## II. DISCUSSION

We preface our analysis of the legal issues by setting out the standard of review. Factual determinations made by the Commission are upheld if supported by the weight of the evidence. *Gimbel v. CFTC,* 872 F.2d 196, 199 (7th Cir.1989); 7 U.S.C. § 9. Several courts have equated the "weight of the evidence" standard with the "preponderance of the evidence" standard used in other contexts. *Morris v. CFTC,* 980 F.2d 1289, 1292 (9th Cir.1992); *Myron v. Hauser,* 673 F.2d 994, 1005 n. 17 (8th Cir. 1982); *Haltmier v. CFTC,* 554 F.2d 556, 560 (2d Cir.1977). Review of legal questions, or of the application of law to facts, depends on the nature of the question and the comparative qualifications and competence of the decisionmakers. *Morris,* 980 F.2d at 1293. When the answer to a question implicates the agency's expertise, a court of appeals will defer to its interpretation of the law if it is reasonable. *Id.* When the question is of the sort that courts commonly encounter, *de novo* review is proper. *Id.; Maloney v. R.J. O'Brien & Associates, Inc.,* 819 F.2d 1435, 1442 (8th Cir.1987). An agency's choice of the proper sanctions for an offender may be reversed only if it is unwarranted in law or unjustified in fact. *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185–186, 93

S.Ct. 1455, 1457–1458, 36 L.Ed.2d 142. When a penalty falls within statutory limits, we review only for an abuse of discretion, asking whether it is rationally related to the offense. *Lawrence v. CFTC,* 759 F.2d 767, 774 (9th Cir.1985); *Flaxman v. CFTC,* 697 F.2d 782, 789 (7th Cir.1983); *G.H. Miller & Co. v. United States,* 260 F.2d 286, 296 (7th Cir.1958) (en banc).

### A. Controlling Person Liability Under Section 13(b)

Monieson was found liable under Section 13(b) of the CEA, 7 U.S.C. § 13c(b), which provides as follows:

Any person who, directly or indirectly, controls any person who has violated any provision of this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

This statute is patterned on similar provisions in the securities laws, 15 U.S.C. § 77o and 78t(a), the primary difference being that in securities cases the defendant must prove good faith, whereas under the CEA the Division of Enforcement has the burden of proving lack of good faith. See *Donohoe v. Consolidated Operating & Production Corp.,* 982 F.2d 1130, 1139 (7th Cir.1992); *In the Matter of Spiegel,* [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,103 at 34,766 (CFTC Jan. 12, 1988).

Monieson challenges his liability under Section 13(b) in three ways. First, he asserts that the statute was only meant to apply in cases where the corporation was a "dummy" or "alter ego" that a defendant set up to shield himself from liability. The very purpose of the statute, he maintains, was to allow the CFTC to pierce the veil of such dummy corporations and reach the individual wrongdoer. See *In the Matter of Apache Trading Corp.,* [1990–1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,251 at 38,794 (CFTC March 11, 1992); *In the Matter of*

*Big Red Commodity Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,623 at 30,668–69 (CFTC June 7, 1985), affirmed, *Rosenthal & Co. v. CFTC*, 802 F.2d 963 (7th Cir.1986); S.Rep. No. 384, 97th Cong., 2d Sess. 47 (1982); H.R.Rep. No. 565, Part I, 97th Cong., 2d Sess. 53 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3902. Second, he alleges that because he did not dominate GNP's operations, he does not qualify as a controlling person. Third, he argues that the Commission never proved that he acted with a lack of good faith.[5]

### 1. Alter Ego

■ The CFTC responds to Monieson's first argument by acknowledging that one purpose of Section 13(b) is to pierce the corporate veil to get at the individuals controlling the corporation. See *Apache Trading, supra*, at 38,794. It balks, however, at any suggestion that the statute may only apply in cases where the controlling person is at the helm of a dummy corporation. It correctly points out that the plain language of the Section contains no such restriction, and thus it may not be read so narrowly. In addition, it produces its own slice of legislative history indicating that Congress contemplated that even the chairman of the board of a large conglomerate could be liable under Section 13(b). H.R.Rep. No. 565, Part I, 97th Cong., 2d Sess. 142 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3991.

Further, Section 13(b) speaks of controlling a "person," not a corporation or firm. As used in the CEA the word "person" is "construed to import the plural or singular, and shall include individuals, associations, partnerships, corporations, and trusts." 7 U.S.C. § 2. If Congress wanted to limit Section 13(b) to the alter ego situation, it would have been more specific; as it stands the Section encompasses those who control individuals, regardless of whether they are also using a corporation as an alter ego.

Finally, as this Court recently observed regarding the securities-law counterpart to Section 13(b), such statutes are "remedial, to be construed liberally, and requir[e] only some indirect means of discipline or influence short of actual direction to hold a control person liable." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (1992) (internal quotation marks omitted), petition for certiorari filed March 29, 1993. Construing Section 13(b) liberally and giving plain meaning to its plain language, we reject Monieson's proposed narrow reading of the law.

### 2. Controlling Person

■ As noted above, Section 13(b) is modelled on the controlling person provisions of securities law. Further, when interpreting Section 13(b) the CFTC has adopted the Securities Exchange Commission's definition of "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Spiegel, supra*, at 34,765 n. 4, quoting 17 C.F.R. § 230.405(f). Consequently, interpretations of the securities statute are relevant to interpreting Section 13(b). This Court recently outlined a two-prong test for a controlling person under that statute.

> The court will first look to whether the alleged control person actually exercised general control over the operation of the entity principally liable. Control person liability will attach if such a person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised.

*Donohoe*, 982 F.2d at 1138 (citation omitted). In its opinion the CFTC decided that Monieson was a controlling person because he made management and hiring decisions and often instructed Arditti and Breitfelder on day-to-day matters. That evidence is certainly sufficient to support a finding that

---

5. Monieson also contends that the CFTC's finding that Furlett and Greenspon misallocated trades is not supported by the record because all of the suspect trades were authorized. In essence this is a challenge to the sufficiency of the evidence. Two administrative bodies, both with

intricate knowledge of the workings (and manipulations) of the futures industry, have already examined the evidence and found that trades were misallocated. Because the record supports that decision, we decline the invitation to reweigh the evidence.

Monieson "exercised general control" over GNP. *G.A. Thompson & Co., Inc. v. Partridge,* 636 F.2d 945, 958 (5th Cir.1981) (officer and director of firm was controlling person where he was involved in day-to-day operations and could influence corporate policy); *Apache Trading, supra,* at 38,795 (defendant was a controlling person when he directed the economic aspects of the firm, established its fee structure and commission rate, and decided who would be allowed to draw against anticipated commissions).

The next question is whether he had "the power or ability to control the specific transaction or activity upon which the primary violation was predicated." Here that activity was Furlett and Greenspon's placement of orders without account numbers and misallocation of trades. We emphasize that it is Monieson's power that matters, not whether he exercised it by actually participating in or benefitting from the illegal acts. See *Harrison,* 974 F.2d at 877–881 (rejecting the "culpable participant" test of other Circuits in favor of a more liberal interpretation of control). The CFTC held that he had such power, and we agree. Though he could not be expected personally to review the enormous number of trades made by GNP employees each day, Monieson certainly had the authority to dismiss or discipline traders for wrongdoing, to put an end to the placement of orders without numbers as soon as he knew of it, or at least to order a full investigation. Indeed, many top GNP employees went to him with their suspicions of illegal activity, indicating that if anyone had the power to clamp down on stray traders it was Monieson. That he had such power qualifies him as a controlling person. See *Donohoe,* 982 F.2d at 1138–1139 (two principal officers of three-man corporation were controlling persons of third owner; they owned sixty percent of the stock, and so could outvote him, and they were heavily involved in day-to-day operations); *G.A. Thompson,* 636 F.2d at 959 ("The test of whether the controlling person has done enough to prevent the violation depends on what he could have done under the circumstances.") (emphasis added).

### 3. Lack of Good Faith

■ To make Monieson liable as a controlling person, the Division of Enforcement also had to prove that he acted with a lack of good faith or that he knowingly induced the acts constituting the violation. 7 U.S.C. § 13c(b). The CFTC found that Monieson failed to act in good faith because he did not respond adequately to the warnings of several employees about Furlett and Greenspon's improper trading. Monieson argues that this finding essentially exposes him to strict liability: he relied on the results of the internal investigation, which he personally reviewed and found to be inconclusive. This may have been bad judgment, he says, but it surely does not amount to bad faith, and therefore he should not be held liable. Moreover, he notes that the CFTC's own Division of Enforcement investigated Furlett and Greenspon's trading over the same period covered by the internal investigation and, like him, found the evidence insufficient to justify any action against the traders. If the CFTC itself found the evidence inconclusive, Monieson asks, why should he be penalized for thinking the same thing?

A controlling person acts in bad faith if he " 'did not maintain a reasonably adequate system of internal supervision and control over the [employee] or did not enforce with any reasonable diligence such system.' " *Harrison,* 974 F.2d at 881, quoting *Henricksen v. Henricksen,* 640 F.2d 880, 884 (7th Cir.1981); *Apache Trading, supra,* at 38,794. The controlling person must also act recklessly; negligence alone is insufficient. *G.A. Thompson,* 636 F.2d at 959, citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 209 n. 28, 96 S.Ct. 1375, 1388 n. 28, 47 L.Ed.2d 668. Though it is a close question, the weight of the evidence supports a finding that Monieson did not enforce GNP's supervision system with reasonable diligence, and that he acted recklessly in doing so.

For beginners, Monieson never took any solid step toward investigating the many warnings he received about Furlett and Greenspon. Allegations that someone is misallocating trades are serious business, and Monieson, who consistently addressed the day-to-day affairs of GNP, ought to have done more than dismiss the complainants as lacking credibility. He also ought to have

reviewed Haun's chart more carefully. At the hearing Monieson testified that if he had known that the customer accounts depicted on the chart were discretionary, he would have been much more suspicious. As an experienced commodities professional, he should have known that the type of account being traded made a difference, and asked about the accounts on the chart. When the compliance department goes through a full internal investigation based on multiple allegations against specific traders, those reviewing the results must do so with care.

Monieson also could have ordered an expanded in-house investigation in February, when he saw that the chart did not completely exculpate the traders, or in May, when by his own admission he knew there was a significant problem. Such an investigation could have either confirmed or dispelled the rumors once and for all. As it happened, Monieson left things in the air. Controlling persons cannot deliberately or recklessly avoid obtaining knowledge about potential wrongdoing. See *Donohoe*, 982 F.2d at 1138 ("[C]orporate officers and directors [cannot] escape liability by remaining as ignorant as possible"). For example, in *Apache Trading* the controlling person, Clancy, neglected to conduct a meaningful investigation of his firm's New York office, even though both the United States Attorney's office and the CFTC had told him that there were problems there. He essentially told his employees to supervise themselves, distancing himself from the activities of the sales force and remaining indifferent to customer complaints. *Apache Trading, supra,* at 38,795. Naturally, the CFTC held that Clancy acted with a lack of good faith. Similarly, Monieson did not act on the allegations against Furlett and Greenspon or follow up when the inside investigation was inconclusive and the complaints continued. His indifference was such that even after Walter told him in May of 1986 that the two traders had been stealing, Monieson let them remain at GNP until October and helped them set up a new business guaranteed by GNP.

We recognize that the scope of the duty to enforce a system of supervision might vary with the controlling person's position. As chairman of the board, Monieson probably had less information about daily affairs at GNP than a front-line supervisor. He therefore had more of a right to rely on the recommendations of subordinates and to base decisions on the information presented to him, rather than personally investigating each complaint. In this case Arditti (and the Division of Enforcement) agreed with Monieson that the evidence of Furlett and Greenspon's trades in early February 1986 was inconclusive, while Schlifke disagreed. Is Monieson thus being penalized because, in hindsight, he took the wrong person's recommendation? No. While the chart compiled by Haun depicted trading in early February 1986, Monieson received complaints from Walter, Gelman, and Haun before that time, but dismissed them as being incredible or malicious. Further, while the CFTC considered the trading results from early February to be insufficient to prosecute, it did not give up its investigation and move along. If it had this case would never have been tried. Just as the CFTC found the trading activity suspicious enough to merit further investigation, so should Monieson have continued to monitor Furlett and Greenspon. When there are repeated charges of illegal behavior from different sources, a controlling person has a duty to act; he cannot simply avoid addressing the issue and hope it goes away. We therefore conclude that the weight of the evidence supports the CFTC's finding of liability under Section 13(b).

B. *Liability for Failure to Supervise Under CFTC Rule 166.3*

█ Monieson was also held liable for failing to supervise Furlett and Greenspon diligently as required by CFTC Rule 166.3, 17 C.F.R. § 166.3, which provides:

> Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents ... of all commodity interest accounts carried, operated, advised, or introduced by the registrant and all other activities of its partners, officers, employees and agents ... relating to its business as a Commission registrant.

According to Monieson this regulation should not have been applied to him because, as board chairman, he was not in the direct line of supervision of Furlett and Greenspon. While he could conceivably be liable if he had failed to supervise GNP's president, chief operating officer, or the compliance department, he claims that he should not be held responsible for those lower in the corporate ladder, including Furlett and Greenspon.

We disagree. Although it may be atypical for a board chairman to have supervisory responsibility, the actions of an individual are more important than his title. In this case Monieson supervised Arditti and Breitfelder, who reported directly to him. He also settled commission disputes and reviewed the internal investigation of Furlett and Greenspon. He was the top link in the supervisory chain, not a disconnected director.

Having concluded that Monieson can be, and was, a supervisor, the only question is whether he lacked diligence in overseeing Furlett and Greenspon. Our discussion of his good faith as a controlling person provides the answer: Monieson did not supervise diligently when he dismissed complaints out of hand and never got around to ordering a thorough in-house investigation or any other action, even when he knew the gravity of the situation. We therefore affirm the CFTC's holding.

## C. *Sanctions*

Monieson maintains that even if he is liable for the charged offenses, the sanctions against him are excessive. Sanctions in CFTC enforcement proceedings should be determined with regard to the gravity of the offense and the need for deterrence. 7 U.S.C. § 13a. When monetary penalties are levied, the Commission will also consider the defendant's net worth. 7 U.S.C. § 9a. In arriving at a specific sanction or combination of sanctions, the Commission will consider "the nature of the violations, the existence of any injuries inflicted on others by reason of these violations, and a review of the sanctions imposed in the past for similar violations." *In the Matter of The Siegel Trading Co.,* [1977–1980 Transfer Binder] Comm.

Fut.L.Rep. (CCH) ¶ 20,452 at 21,847 (CFTC July 26, 1977).

If an administrative agency chooses a sanction that falls within statutory limits, review is highly deferential.

> [I]f the order of an administrative agency finding a violation of a statutory provision is valid and the penalty fixed for the violation is within the limits of the statute the agency has made an *allowable judgment in its choice of remedy* and ordinarily the Court of Appeals has no right to change the penalty because the agency might have imposed a different penalty.

*G.H. Miller & Co. v. United States,* 260 F.2d 286, 296 (7th Cir.1958) (en banc). The exception to this rule is that sanctions may be modified or reversed where "'the remedy selected has no reasonable relation to the practice found to exist.'" *Id.,* quoting *Daniels v. United States,* 242 F.2d 39, 42 (7th Cir.1957). As the Supreme Court put it in *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 an agency's choice of sanction will not be overturned unless it is "'unwarranted in law or ... without justification in fact.'" *Id.* at 185–186, 93 S.Ct. at 1457–1458, quoting *American Power Co. v. SEC,* 329 U.S. 90, 112–113, 67 S.Ct. 133, 145–146, 91 L.Ed. 103.

### 1. Trading Ban

■ The ALJ banned Monieson from trading on any contract market for life, even though the Division of Enforcement had not asked for any ban at all. The Commission then reduced the prohibition to two years, noting that some restriction was called for but that lifetime bans were rarely appropriate. According to the Commission some trading ban was justified because there was a nexus between Monieson's wrongdoing and the integrity of the futures market. This "nexus" requirement comes from *In the Matter of Incomco, Inc.,* [1990–1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,198 at 38,537 (CFTC Dec. 30, 1991), where the Commission wrote that "[a] trading prohibition is a remedial sanction imposed to protect the futures markets from conduct which inherently threatens their orderly operation." *Id.* Monieson argues that there was no nex-

us between his violations and the integrity of his futures market. His position is that while the violations of Furlett and Greenspon—for which Monieson is equally responsible under Section 13(b)—may have harmed their customers, they were still trying to maximize their profit on each trade. Consequently, prices were not artificially inflated or deflated, and the integrity of the market remained intact. As Monieson sees it, the CFTC has confused Furlett and Greenspon's lack of integrity with a lack of integrity in the market.

While this argument has some surface appeal, the CFTC has employed a broader, equally defensible interpretation of what affects the integrity of the futures market, and we will defer to that interpretation. See *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 969 (7th Cir.1986). Furlett and Greenspon's misallocation of trades may not have affected the price of futures contracts or interfered with normal trading patterns, but it could certainly be viewed as affecting the public perception of the market. Customers were having losing trades dumped in their accounts by brokers who were almost able to cover it up. Such malfeasance certainly diminishes the integrity of the market in the public eye. It also "threatens the orderly operation of the market" by ignoring procedural rules designed to prevent fraud. See *Incomco, supra*, at 38,537 (trading ban was justified where Incomco "fail[ed] to carry a futures account in the true name of the person for whom the account was maintained" and failed to file required reports with the Commission). Moreover, the scheme may well have affected the market itself after all, since Furlett and Greenspon did not have to be as prudent about placing trades when they knew that any losers could just be palmed off on unsuspecting customers.

Thus a trading ban was justified, leaving only the question of whether a two-year ban is too severe a penalty for Monieson's acts. In answering that question we keep in mind that administrative agencies are given the discretion to employ sanctions so as "to deter violations and achieve the objectives of the statute." *Glover Livestock*, 411 U.S. at 188–189, 93 S.Ct. at 1459. A two-year ban is certainly a harsh penalty (though of course much preferable to the ALJ's lifetime proscription), especially where the Division of Enforcement never requested it. This is also a novel application of the sanction; the CFTC informed us at argument that a trading ban has previously never been imposed on a controlling person. Nevertheless, we cannot say that it bears no rational relationship to the offenses. Monieson held a responsible position in a highly regulated industry, but failed to follow up on numerous warnings that rules were being violated. He thereby facilitated a sizeable fraud, meriting stern penalties. Cf. *Incomco, supra*, (upholding two-year ban); *In the Matter of Lincolnwood Commodities, Inc. of California*, [1982–1984 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 21,986, at 28,960 (thirty-three month trading ban for fraudulent allocation of trades and conversion and misappropriation of customer funds).

### 2. Revoked Registration

The Commission also revoked Monieson's registration as a floor broker. Monieson was presumptively unfit for registration because he had violated Section 13(b) of the CEA and Rule 166.3. See *Silverman v. CFTC*, 562 F.2d 432, 438 (7th Cir.1977); 7 U.S.C. § 9. Though the presumption could be rebutted with evidence of mitigation or rehabilitation, *id.*; *Savage v. CFTC*, 548 F.2d 192, 196 (7th Cir.1977), Monieson did not carry his burden. Since he cannot offer any new evidence at this stage, we affirm the sanction, noting that he can reapply in the future and regain his registration by proving he has been rehabilitated. *Silverman*, 562 F.2d at 439; 7 U.S.C. § 12a(2)(A).

### 3. $500,000 Civil Penalty

■ Finally, the Commission imposed a $500,000 penalty on Monieson, equal to the unappealed penalty against GNP itself. Because this was within the statutory range of $100,000 for each violation,[6] 7 U.S.C. § 9, we review for a rational relationship to the of-

---

**6.** Under Section 13(b) Monieson is responsible for each of Furlett and Greenspon's violations.

He does not argue that they violated the CEA fewer than five times.

fenses. *G.H. Miller*, 260 F.2d at 296–297. This is the most troubling of the sanctions because the CFTC paid scant attention to Monieson's distinct, individual culpability or the extent of the damage done, and because it far exceeds fines levied in analogous cases.

To decide whether the fine here is rationally related to the offense, we look to the three factors listed in *Siegel, supra*, and cited by the CFTC here. First is the nature of the violations. Monieson's offenses are serious. Duties are imposed on controlling persons and supervisors to encourage them to weed out illegal activity aggressively, and when this system of self-regulation breaks down, both the integrity of the market and customers suffer. There can be little tolerance for those who do not fulfill their responsibilities if the CFTC wants to keep the commodity futures industry free of corruption. Grave as such violations are, however, the fact is that Monieson did not personally benefit from Furlett and Greenspon's fraud. His was an act of reckless nonfeasance, not malfeasance. While that is enough for liability, it ought to make a difference when meting out punishment.

The second consideration is the injury caused to others by the violations. Customers lost $180,000 as a result of the scheme here, while Furlett and Greenspon gained $120,000, bringing the total injury to $300,-000. Of course, as the CFTC noted, the harm could actually have been larger (records were not available for all trades made during the life of the scheme) or smaller (customers would have suffered some losing trades no matter what happened), but $300,-000 is the best estimate we have. *GNP Commodities, supra*, at 39,222–23. Using that figure, it is difficult to fathom how the CFTC saw fit to fine Monieson two-thirds more than the total harm caused by a scheme that he did not devise or profit from. Moreover, it appears that the Commission did not distinguish between Monieson and GNP: it gave them both the same fine and justified its decision by discussing GNP's offenses, calling them "intentional and egregious," while never separately discussing Monieson's culpability. *Id.* at 39,223. It also based its decision on the exemplary purpose of penal-

ties and the need to inflate the fine in order to compensate for undetected violations. *Id.* But any undetected violations were GNP's fault: it was GNP that failed to keep proper records, not Monieson, so that cannot be used against Monieson. Thus there was no basis besides general deterrence for augmenting his fine, and though that is a legitimate factor, it seems slim justification for such a large increase.

The third consideration under *Siegel* is the penalties used in similar cases. Although an agency sanction is "not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases," *Glover Livestock*, 411 U.S. at 187, 93 S.Ct. at 1459, the Commission's citation to *Siegel* indicates that it considers consistency to be an element in shaping sanctions. See also *In the Matter of Nelson, Ghun & Associates, Inc.*, [1984–1986 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 22,584 at 30,527 (CFTC May 2, 1985). Turning, then, to similar cases, we discover that the fine here is in a league of its own. In *Apache Trading*, discussed above, customers lost over $1.13 million, but the controlling person, whose offenses were easily as grave as Monieson's, absorbed a (comparatively) scant $70,000 fine. Likewise, in *Spiegel*, the controlling person, who was liable for his company's commingling of customer and proprietary funds, was fined only $70,000.

Neither of these cases involved a fine restricted by the offender's net worth; rather, the CFTC simply believed that $70,000 was sufficient to punish the offender and dissuade others from similar misconduct. Indeed, a fine like Monieson's has been reduced even when the defendant violated the CEA "knowingly, repeatedly, and flagrantly, and then attempted to conceal the activity from the Commission." *Incomco, supra*, at 38,536. There the Commission reduced a $550,000 fine to $105,000, finding that it more accurately corresponded to the gravity of the offenses, which included conversion of $550,-000 of customer funds and deliberate avoidance of Commission reporting requirements. *Id.* The CFTC and ALJ, however, did not discuss or distinguish any of these yardstick decisions.

Although our review of administrative sanctions is extremely deferential, we believe that this is one of those rare cases where a sanction, though within statutory limits, must nevertheless be modified because it bears no rational relationship to the offense or the need for deterrence. Not only is it far greater than the total harm caused, but it also dwarfs fines given in similar cases and fails to reflect any consideration of the difference in culpability between Monieson and GNP. Thus under the authority granted to us by 7 U.S.C. § 9 to set aside or modify the Commission's penalties, we reduce the civil monetary penalty against Monieson to $200,000.

### D. *Ex Parte Communications*

Monieson's final claim is that the CFTC's decision is tainted because the ALJ sent a letter to the Commission mentioning the case while the appeal was still pending and because the Commission was under pressure from Congress to intensify its enforcement of the CEA.

ALJ George Painter's letter to the CFTC expressed his dismay at a proposal by the Chicago Mercantile Exchange to change its rule requiring orders for trades to bear the customer's account number. Under the proposed rule orders could be placed without account numbers, so long as the accounts were identified by the end of the business day. In the letter Judge Painter worries that the proposed rule would make it easy for brokers to misallocate trades. While explaining his position, he congratulates the Division of Enforcement for its efforts in uncovering the fraud at GNP. An appendix to the letter written by another, but with which Judge Painter expressed his agreement, discussed this case as an example of a situation where requiring order numbers on tickets proved vital in uncovering a fraud.

Monieson believes that the ALJ's letter contravenes a provision of the Administrative Procedure Act prohibiting *ex parte* comments on pending cases. See 5 U.S.C. § 557(d)(1)(B). That statute, however, only forbids communication with "any interested person *outside* the agency." *Id.* (emphasis added). Members of the CFTC are certainly *inside* the agency, and, in any event, the

letter was sent to Jean Webb in the CFTC's Office of the Secretariat. Jean Webb is not a member of the Commission and so was not involved in reviewing the case. In addition, the statements in the letter and appendix did not amplify or add to the record already before the CFTC. Since the letter did not tell the CFTC anything it did not already know, we see no reason to use it as a basis for overturning the decision. We do believe, however, that the comments were gratuitous and ill-advised, and while ALJs certainly ought to feel free to participate in policy debates, they should take care to avoid referring to pending cases.

As to the claim that political pressure forced the Commission's hand, we note that at least one Circuit has recognized that in extreme cases Congressional interaction with agencies can go too far. "[W]hen an investigation focuses directly and substantially upon the mental decisional processes of a Commission in a case which is pending before it, Congress is no longer intervening in the agency's legislative function, but rather, in its judicial function." *Pillsbury v. FTC*, 354 F.2d 952, 964 (5th Cir.1966). On the other hand, Congressional "interest in the objective and efficient operation of regulatory agencies serves a legitimate and wholesome function with which [courts] should not lightly interfere." *Gulf Oil Corp. v. FPC*, 563 F.2d 588, 610 (3d Cir.1977). Congress did not take an interest in this case above all others. Senator Patrick Leahy, Chairman of the Senate Committee overseeing the CFTC, simply became alarmed at the trend in CFTC policy and wrote a letter to Commission Chairman Gramm asking her to respond to some general questions. At no time did the senator or any other politician lean on the CFTC to decide this case in a particular way. What occurred was legitimate oversight, not overreaching.

### III. CONCLUSION

In sum, we conclude that the weight of the evidence supports the CFTC's findings that Brian Monieson was a controlling person of Furlett and Greenspon and that he acted with a lack of good faith. The evidence also supports the finding that he failed to dili-

gently supervise the brokers. As to the CFTC sanctions, we affirm the trading ban and the decision to revoke Monieson's registration as a floor broker, but reduce the $500,000 fine to $200,000.

AFFIRMED AS MODIFIED.