**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

COMMODITY FUTURES TRADING
COMMISSION,
                    *Plaintiff-Appellee,*

                v.

ESFAND BARAGOSH, a/k/a Esfandiar
Baragosh,
                    *Defendant-Appellant,*

                and

NOBLE WEALTH DATA INFORMATION
SERVICES, INCORPORATED, a/k/a Noble
Wealth, Incorporated, a/k/a Nobel
Wealth, Incorporated; INTERNATIONAL          No. 00-1488
ADVANCED INVESTMENT(S),
INCORPORATED; NOBLE WEALTH
DEVELOPMENT, LTD.; BULL & BEARS,
LTD., a/k/a Bull & Bears
International Investment, Ltd.;
CURREX INTERNATIONAL CORPORATION,
                    *Defendants,*

                v.

EBC FULTON ENTERPRISES,
INCORPORATED; RALPH S. TYLER,
                    *Parties in Interest.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-98-3316-PJM)

Argued: November 2, 2001

Decided: January 22, 2002

Before WILKINSON, Chief Judge, and WILLIAMS and
MOTZ, Circuit Judges.

_____

Affirmed in part and vacated and remanded in part by published opinion. Judge Motz wrote the opinion, in which Judge Wilkinson joined. Judge Williams wrote an opinion concurring in part and concurring in the judgment.

_____

## COUNSEL

**ARGUED:** Matthew G. Kaiser, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. C. Maria Dill Godel, Office of the General Counsel, COMMODITY FUTURES TRADING COMMISSION, Washington, D.C., for Appellee. **ON BRIEF:** Steven H. Goldblatt, Director, Wendy M. Marantz, Supervising Attorney, Rita Graham, Student Counsel, Darren P. Nicholson, Student Counsel, Erin Roth Bohannon, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Kirk T. Manhardt, Deputy General Counsel, Office of the General Counsel, COMMODITY FUTURES TRADING COMMISSION, Washington, D.C., for Appellee.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In 1998, the Commodity Futures Trading Commission filed a complaint alleging that Esfand Baragosh was a controlling person of Noble Wealth Data Information Services and several related companies (collectively "Noble Wealth"), which operated as a sham futures exchange in violation of the Commodity Exchange Act. *See* 7 U.S.C.A. § 1 *et seq.* (West 1999), *amended by* Commodity Futures Modernization Act (CFMA), Pub. L. No. 106-554, 114 Stat. 2763

(2000).[1] The district court entered a default judgment against the companies and subsequently granted summary judgment to the Commission against Baragosh. The court ordered Baragosh to make restitution of $5,264,251 plus pre- and post-judgment interest, and assessed a civil penalty of $1,211,058 plus post-judgment interest against him. *CFTC v. Noble Wealth Data Info. Sys.*, 90 F. Supp. 2d 676 (D. Md. 2000). The court also issued several injunctions against Baragosh. On appeal, Baragosh argues that the Commission lacked jurisdiction to regulate Noble Wealth's activities, and, in any event, that he was not a controlling person of Noble Wealth and therefore is not liable for Noble Wealth's illegal activities. We affirm in part, and vacate and remand in part.

## I.

Noble Wealth, which was incorporated in California in 1993, has never been designated as a contract market for the trading of foreign currency futures contracts nor ever registered with the Commission in any capacity. In 1994, the company opened an office in Atlanta, Georgia, and began to operate the foreign currency trading scam at issue in this suit. In 1996, it expanded the scam by opening an office in Bethesda, Maryland; and it expanded again in 1998, to a third office in Duluth, Georgia.

To lure its victims, Noble Wealth placed "help wanted" ads in general circulation newspapers, claiming that it was "looking for [persons] to be trained to become consultants." Those who replied were invited to visit Noble Wealth, and ultimately encouraged to attend a training program. The program consisted of four sessions, each no longer than two hours, during which videotapes describing investment strategies and the mechanics of trading currency through Noble Wealth were shown. Trainees were told that they could become traders by opening an account of $10,000 or more with Noble Wealth, and were urged to solicit their families and friends to open accounts and become "customers" of Noble Wealth.

---

[1]Congress enacted several important changes to the CEA in 2000. *See* CFMA. Unless otherwise noted, all references and citations to the CEA are to the pre-2000 statute. We also note the post-2000 location of each statutory section the first time we cite that section.

To whet the trainees' appetites, Noble Wealth distributed brochures informing them that its traders had earned returns as high as 31.15% in a few days, 192.5% in one month, 906% in three months, and 532% in six months. The brochures explained that these exceptional returns were possible because Noble Wealth had well-placed contacts in the interbank market, allowing it to offer the "best buy-sell quotation for clients all over world." Assertedly, trades would be placed through Noble Wealth's Hong Kong subsidiary ("Noble Wealth HK"), which the brochures described as a "licensed Financial Brokerage House with daily turnovers in excess of 100 million dollars." Finally, the brochures promised that customer accounts would be overseen by "highly trained investment consultants."

Those who opened an account were entitled to use Noble Wealth's "trading floor," where rows of computer monitors were set up to display current prices of various foreign currencies. When a trader saw a desirable price, he or she completed a Noble Wealth order ticket describing the number of contracts to be bought or sold, the foreign currency to be traded, and the price reflected on the computer monitor. The trader brought the ticket to a Noble Wealth employee (called a "dealer"), who assertedly called Noble Wealth HK for a price quote and then relayed the quote to the trader. If the trader accepted the price, the dealer completed the order ticket by filling in the execution price for the trade. Periodically, Noble Wealth issued detailed account statements, which purported to track commissions, fees, and movements in the value of customer contracts.

This was all an elaborate hoax. Noble Wealth HK was not a licensed brokerage house, and there is no evidence that Noble Wealth actually purchased any foreign currency contracts that corresponded to customer orders. Rather, as Baragosh testified at the hearing in which the Commission sought a preliminary injunction, Noble Wealth's Maryland office passed its traders' currency contract orders to a "head dealer" at Noble Wealth HK who attempted to match customer buy and sell orders every half hour. In other words, Noble Wealth operated a bucket shop, taking the opposite side of a customer's order rather than openly and competitively executing the order on an exchange. Noble Wealth's customers lost the bulk of the funds they invested, which were diverted to pay operating expenses, salaries

and commissions, and the personal expenses of Noble Wealth employees.

Baragosh oversaw training and recruitment at the Georgia and Maryland offices. He placed Noble Wealth's "help wanted ads," appeared in its training videos, walked the floor advising the traders on strategy, and exhorted traders to "trade, trade, trade." In return, Baragosh received a personal commission of two dollars for every trade executed at Noble Wealth.

The Commission charged and the district court found that Baragosh and the companies had: (1) misappropriated customer funds and committed fraud in violation of 7 U.S.C. § 6b(a)(i)-(iii); (2) bucketed customer orders in violation of 7 U.S.C. § 6b(a)(iv); and (3) offered to sell commodity futures contracts other than on a board of trade designated as a contract market in violation of 7 U.S.C. § 6(a). Only Baragosh appeals.

## II.

Baragosh's principal contention on appeal is that Congress did not intend Noble Wealth's admittedly fraudulent activities to be regulated by the Commodity Exchange Act ("CEA" or "the Act"). Resolving this question requires an understanding of the CEA's history and purpose.

## A.

From its enactment in 1936 through all periods material to this case, the CEA required futures contracts on certain commodities to be traded only on government-approved public exchanges, termed "contract markets." *See* Commodity Exchange Act, Pub. L. No. 74-675, § 4, 49 Stat. 1491, 1492 (1936), *amending* Grain Futures Act, Pub. L. No. 67-331, § 4, 42 Stat. 998 (1922); *compare* 7 U.S.C.A. § 6(a) (West 1999) (same). *See also* Lynn A. Stout, *Why the Law Hates Speculators: Regulation and Private Ordering in the Market for OTC Derivatives*, 48 Duke L.J. 701, 722 (1999). Contract markets, in turn, were required to conduct business according to standards set forth in the Act. Two of those standards are important in this case.

First, the CEA contained anti-fraud measures designed to protect both small investors and the market as a whole. *See* CEA § 4b, 49 Stat. at 1493 (making it unlawful for persons associated with a contract market to "cheat or defraud," "willfully to make or cause to be made . . . any false report or statement . . . or false record," or "willfully to deceive or attempt to deceive . . . by any means whatsoever"). These measures complemented and strengthened existing provisions that already applied to futures trading in grain markets. *See* Grain Futures Act, § 5(c), 42 Stat. at 1000 (requiring contract markets to adopt internal rules "prevent[ing] . . . dissemination by the board or any member thereof, of false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of grain").

Second, the CEA made it unlawful for any member of a contract market to "bucket" an order. *See* CEA § 4b(D), 49 Stat. at 1493. "Bucketing" is commonly done by a so-called "bucket shop": a business that allows customers to speculate on movements in commodity prices by entering into contracts with the shop rather than by finding a trading partner on the floor of an exchange. *See* Armando T. Belly, *The Derivative Market in Foreign Currencies and the Commodity Exchange Act — The Status of Over-the-Counter Futures Contracts*, 71 Tul. L. Rev. 1455, 1473 (1997). In effect, a bucket shop "assumes the risk of the transaction that would be assumed by the market in an exchange transaction." *Id.* Such shops are viable only so long as they maintain a rough balance between the value of their buy and sell contracts and customers pay any debts they owe. When a shop miscalculates, as inevitably occurs, its owners are likely to close shop without settling accounts. *Id.* In the first decades of the twentieth century, the common law disfavored bucket shops by refusing to enforce their contracts with speculators, and many state legislatures imposed civil or criminal penalties on bucket shop operators. Stout, *Why the Law Hates Speculators*, 48 Duke L.J. at 721. Federal law effectively banned bucket shops from grain futures trading beginning in 1921, *see* Future Trading Act, §§ 2(a), 4, Pub. L. No. 67-66, 42 Stat. 187 (1921); Grain Futures Act, 42 Stat. at 998-1000, and the CEA extended the prohibition to several new commodity markets. William L. Stein, *The Exchange Trading Requirement of the Commodity Exchange Act*, 41 Vand. L. Rev. 473, 486-92 (1988) (reviewing history of bucket shop prohibition).

In 1968, the CEA's anti-bucketing provision and its new anti-fraud rules were amended, so that they applied not only to persons associated with contract markets but also to "*any* person[s]" acting "in or in connection with any order to make, or the making of" futures contracts in a regulated commodity. *See* An Act to amend the Commodity Exchange Act, § 5(a)(2), Pub. L. 90-258, 82 Stat. 26, 27 (1968) (emphasis added), *relevant sections codified as amended at* 7 U.S.C.A. § 6b(a)(i)-(iv).

Over time, the number of covered commodities was also enlarged. When it was first enacted in 1936, the CEA applied only to futures markets in a few agricultural commodities, such as grain, butter, eggs, and Irish potatoes. CEA § 3(a), 49 Stat. at 1491. Over the next several decades, Congress expanded the Act's reach commodity by commodity: "wool tops in 1938; fats and oils, cottonseed, cottonseed meal, peanuts, soybeans, and soybean meal in 1940; wool in 1954; onions in 1955; and livestock, livestock products, and frozen concentrated orange juice in 1968." Belly, *Derivative Market in Foreign Currencies*, 71 Tul. L. Rev. at 1475. By 1974, Congress decided that the "growing importance of futures markets" merited a comprehensive regime of regulation. *See* S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5858-60 (noting that "many large and important futures markets [we]re completely unregulated by the Federal Government" and that the value of futures trading had already "substantially exceed[ed] the value of securities trading on the various stock exchanges").

Therefore, the legislature modified the CEA in two important respects. First, Congress expanded the CEA's jurisdiction to include futures trading on "all other goods and articles . . . and all services, rights and interests in which contracts for futures delivery are presently or in the future dealt in." Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395 (1974) (amending CEA) (currently codified at 7 U.S.C.A. § 1a(3) (West Supp. 2001)). Second, Congress created a new commission, the Commodity Futures Trading Commission, invested with broad power to enforce the Act. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 365-66 (1982) (noting that the Commission was authorized to investigate complaints and grant reparations for violations of the law; seek injunctive relief; alter or supplement a con-

tract market's rules; and "direct a contract market to take whatever action [was] deemed necessary by the Commission in an emergency"). According to the House Committee on Agriculture, these changes were intended to "significantly increase public confidence in the futures markets by providing the same protection to the unregulated commodity customers that is now afforded the regulated commodity customers." H.R. Rep. No. 93-975, at 62 (1974).

Citing the same objective, the Senate expressly identified foreign currency futures trading as an activity it intended to bring within the Act:

> While the futures markets in a number of agricultural commodities have been regulated in varying degrees since 1922, many large and important futures markets are completely unregulated by the Federal Government. These include . . . the highly sensitive silver market and *markets in a number of foreign currencies*. A person trading in one of these unregulated futures markets should receive the same protection afforded to those trading in the regulated markets.

S. Rep. No. 93-1131, *reprinted in* 1974 U.S.C.C.A.N. at 5859 (emphasis added). While the bill was pending, however, the Department of Treasury sent a letter to the Senate Committee with jurisdiction over the bill, expressing concern about the effect that CEA regulation could have on one part of the foreign currency futures market. The letter advised the Committee that:

> [v]irtually all trading in foreign currencies in the United States is carried on through an informal network of banks and dealers. This dealer market, which consists primarily of the large banks, has proved highly efficient in serving the needs of international business in hedging the risks that stem from foreign exchange rate movements. The participants in this market are sophisticated and informed institutions, unlike the participants on *organized* exchanges, which, in some cases, include individuals and small traders who may need to be protected by some form of governmental regulation.

*Id.* at 5887-88 (emphasis in original).

Treasury argued that regulation by the new Commission would only burden and confuse traders in the informal dealer market without improving market fairness or transparency. *Id.* at 5888-89. To protect this segment of the market, Treasury proposed an amendment that would "make clear" that the Commission's jurisdiction over foreign currency futures was limited to "organized exchanges." *Id.* at 5889. The suggested amendment provided, in pertinent part, that "[n]othing in this Act shall be deemed to govern or in any way be applicable to transactions in foreign currency . . . unless such transactions involve the sale thereof for future delivery conducted on a board of trade." *Id.*

It appears that the Senate Committee was persuaded. Except to delete "puts and calls for securities" from the list of exempted transactions, the Committee accepted the proposed language without change (so that the text adopted has come to be known as the "Treasury Amendment"). In its report, the Committee repeatedly stated that the amendment was intended to protect banks and other sophisticated traders by exempting all foreign currency transactions not on organized exchanges:

> [T]he Committee amendment provides that inter-bank trading of foreign currencies and specified financial instruments is not subject to Commission regulation . . . .

*Id.* at 5848.

> Also, the Committee included an amendment to clarify that the provisions of the bill are not applicable to trading in foreign currencies and certain enumerated financial instruments *unless such trading is conducted on a formally organized futures exchange*. A great deal of the trading in foreign currency in the United States is carried out through an informal network of banks and tellers. The Committee believes that this market is more properly supervised by the bank regulatory agencies and that, therefore, regulation under this legislation is unnecessary.

> Likewise, the Committee believes that regulation by the Commission of transactions in the specified financial instruments . . ., which generally are between banks and other sophisticated institutional participants, is unnecessary, *unless executed on a formally organized futures exchange*.

*Id.* at 5863-64 (emphasis added).

The Senate Committee's report was not Congress' final word on the Treasury Amendment. A Conference Committee subsequently met to reconcile House and Senate versions of the proposed legislation, and apparently dropped the Senate Committee's distinction between on-exchange and off-exchange trading. Instead, the Conference Committee's report explained that the Treasury Amendment "provides that *interbank* trading of foreign currencies . . . is not subject to Commission regulation." Conf. Rep. No. 93-1383 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897 (emphasis added). With this understanding, Congress enacted the amendment language that had been submitted by the Senate.

### B.

Baragosh and the Commission agree that the Noble Wealth transactions were "in foreign currency" and that the Treasury Amendment, therefore, exempted these transactions from regulation under the CEA unless the transactions were "conducted on a board of trade." 7 U.S.C.A. § 6(a)(1) (West 1999).

From its inception through the time of the events at issue here, the CEA, like its statutory predecessors, included an exceedingly broad definition of "board of trade." Thus, during all relevant periods, the statute provided that the term "board of trade" meant "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity or receiving the same for sale on consignment." 7 U.S.C.A. § 1a(1) (West 1999), *amended by* 7 U.S.C.A. § 1a(2) (West Supp. 2001). *Compare* Future Trading Act, 42 Stat. 187 (1921) (CEA predecessor statute) ("board of trade" is "any exchange or association, whether incorporated or unincorporated, of persons who shall be engaged in the business of buying or selling grain or receiving the same for sale

on consignment"). This definition encompassed virtually every situation in which futures were or ever could be traded. *See, e.g.*, *CFTC v. Frankwell Bullion Ltd.*, 99 F.3d 299, 302 (9th Cir. 1996) ("Almost all transactions in futures contracts could be characterized as occurring on a board of trade involving informal associations of people engaged in the business of buying and selling commodities.") (internal quotation marks and citation omitted).

The breadth of this definition evidences Congress' general purpose to regulate futures trading in covered commodities as fully as possible. But, of course, for over five decades foreign currency was not a covered commodity. When Congress determined to regulate foreign currency in 1974, it did so with the specific understanding that certain transactions — trading "between banks and other sophisticated institutional participants" not "conducted on a formally organized futures exchange" — would *not* be subject to regulation under the CEA. *See* S. Rep. No. 93-1131, *reprinted in* 1974 U.S.S.C.A.N. at 5863-64. Hence, the Treasury Amendment. *See* 7 U.S.C. § 2(i).

Using the broad statutory definition of "board of trade" in construing the Treasury Amendment would, as one of our sister circuits recently noted, "render[] the Treasury Amendment meaningless." *Frankwell Bullion*, 99 F.3d at 302. If the definition were inserted, the Amendment would exempt all futures transactions in foreign currency from the CEA unless such transactions were "conducted on any exchange or association whether incorporated or unincorporated of persons who are engaged in the business of buying or selling any commodity or receiving the same for sale or consignment." In effect, the Amendment's first clause would exempt all foreign currency transactions from the CEA, and its second clause would sweep all, or almost all, such transactions back in.

Such an interpretation would be directly at odds with a cardinal rule of statutory construction — "that a statute should be interpreted so as not to render one part inoperative." *Mountain States Tel. & Tel. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)). We are particularly loathe to violate this rule in construing the Treasury Amendment, because the Supreme Court has recently made plain that it does not regard the Amendment as surplusage. *See Dunn v. CFTC*, 519 U.S. 465, 472,

473 (1997) (rejecting an interpretation of the Treasury Amendment that would have left it "without any significant effect at all" because "legislative enactments should not be construed to render their provisions mere surplusage.") (citation omitted).

This use of § 1a(1) in interpreting the Treasury Amendment would also frustrate the Amendment's very purpose. "Congress' broad purpose in enacting the Treasury Amendment was to provide a general exemption from CFTC regulation for sophisticated off-exchange foreign currency trading." *Dunn*, 519 U.S. at 473. To insert § 1a(1) in the Amendment would eliminate this "general exemption from CFTC regulation." *Id.*

Perhaps for these reasons, not even the Commission suggests that § 1a(1)'s definition should be inserted wholesale into the Treasury Amendment to eliminate the Amendment's exemption and provide the Commission with jurisdiction over *all* foreign currency trading. Rather, like Baragosh, the Commission looks to the purpose and history of the Treasury Amendment to discern the scope of the exemption. However, the parties use the same tools of statutory construction to reach very different results.

Baragosh, relying heavily upon the Treasury letter and Senate Report, contends that Congress intended to exempt all futures trading "unless such trading is conducted on a formally organized futures exchange." S. Rep. No. 93-1131, *reprinted in* 1974 U.S.S.C.A.N. at 5863. Recently, the Ninth Circuit adopted a position similar to that urged by Baragosh. *See Frankwell Bullion*, 99 F.3d at 304 ("We find that the legislative history [i.e., the Senate Committee Report and the Treasury letter] conclusively determines that Congress intended the term 'board of trade' in the Treasury Amendment to mean on-exchange.").

In reply, the Commission concedes that the Treasury Department and the Senate Committee on Agriculture may have intended to exempt all off-exchange trading, but argues that the Conference Committee report, which neither Baragosh nor the *Frankwell Bullion* court discuss, better describes Congress' intent. Although we respect the view of our sister circuit, we are persuaded for the reasons that follow that the Commission's position on this question is correct.

A Conference Committee report is generally acknowledged as the best guide to legislative intent short of the statute itself, because it "represents the final statement of terms agreed upon by both houses of Congress." *Davis v. Lukhard*, 788 F.2d 973, 981 (4th Cir. 1986). Moreover, in this case, the Conference Committee's account of the Treasury Amendment also accords with Congress' broader purpose in passing the 1974 amendment. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (noting that courts strive to "interpret [each] statute 'as a symmetrical and coherent regulatory scheme,' and [to] 'fit, if possible, all parts into an harmonious whole'") (citations omitted).

When Congress amended the CEA in 1974, its main purpose was to extend the Act's regulatory protections to previously uncovered futures markets, so as to "provide . . . viable market[s] in which the public can have confidence." S. Rep. No. 93-1131, *reprinted in* 1974 U.S.C.C.A.N. at 5859. *See also id.* at 5859 ("A person trading in one of the [] unregulated markets should receive the same protection afforded to those trading in the regulated markets."); Senate Comm. on Agric. and Forestry, 93d Cong., 2d Sess., Commodity Futures Trading Commission Act of 1974 at 6 (Comm. Pr. 1974) (statement of Chr. Talmadge) ("[I]t was the intent of the [Conference Committee] to fill all regulatory gaps"). Near the core of those regulatory protections was a ban on bucket shops and firm hostility toward fraud and manipulation, both of which had been part of the CEA and its predecessors for more than fifty years. *See, e.g.*, 7 U.S.C.A. § 6(a) (West 1999) (prohibiting futures trades outside contract markets); 7 U.S.C.A. § 6b(a)(i)-(iv) (West 1999) (prohibiting fraud and bucketing); 7 U.S.C.A. § 7(3) (West 1999) (requiring contract markets to adopt anti-fraud rules).

If Congress had enacted a broad loophole for foreign currency trading, through which bucket shops and fraudulent marketing could freely escape regulation, it would have left the foreign currency market substantially unprotected and undermined its basic purpose with respect to that market. Although obviously the Treasury Department did persuade Congress to protect sophisticated individuals and institutions from regulatory interference by the Commission, we would expect Congress to have enacted an exemption no larger than neces-

sary. And this, the Conference committee report tells us, is exactly what Congress did.

Of course, the exempted "interbank" market consists of more than banks. When legislators discussed this market, they spoke of "an informal network of banks *and tellers*," or of "banks *and other sophisticated institutional participants*." S. Rep. No. 93-1131, *reprinted in* 1974 U.S.C.C.A.N. at 5963-64 (emphasis added). Likewise, the Treasury letter referred to a network of "banks *and dealers*," or "*sophisticated and informed institutions*." *Id.* at 5887, 5888 (emphasis added). What distinguished interbank market participants was not their institutional form, but their wealth, experience in the market, and knowledge of finance. They could trade in "informal networks" among themselves, while the general public was able to trade foreign currency futures only with the assistance of formal institutions that provided standard contracts, margin trading, and a means of finding other traders. *Id.*

Accordingly, as we have previously held, "it [wa]s the nature of the trade (whether a standardized trade within an organized market or an individually negotiated private deal) . . . that determine[d] whether a trade [wa]s within the Act." *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 977 (4th Cir. 1993). Transactions in foreign currency were not subject to Commission jurisdiction in the period at issue in this case if they were "large-scale, customized, negotiated, bilateral transactions between sophisticated financial professionals." *Id.* But they were subject to its jurisdiction if they were small, standardized, offered as-is, and mass marketed to individuals.[2] Under this standard, the trades at Noble Wealth were certainly not exempted by the Treasury Amendment, but rather included within the CEA's jurisdiction.

---

[2]We recognize that there is language in *Tauber* that might be read to suggest that the Treasury Amendment exempts all off-exchange trading. This language is dictum. As the *Tauber* panel noted: "We hold *only* that individually-negotiated foreign currency option and futures transactions between sophisticated, large-scale foreign currency traders fall within the Treasury Amendment's exclusion from CEA coverage." *Tauber*, 8 F.3d at 978 (emphasis added). Any question about the Amendment's application to bucket shops, like Noble Wealth, was therefore reserved.

Finally, we note that after this litigation began, Congress enacted the Commodity Futures Modernization Act (CFMA), "to clarify the jurisdiction of the Commodity Futures Trading Commission over certain retail foreign exchange transactions and bucket shops that may not otherwise be regulated." CFMA § 2(5), Pub. L. No. 106-554, 114 Stat. 2763 (2000). Under the CFMA, the Commission has jurisdiction over foreign currency futures "offered to or entered into" with any person who is not an "eligible contract participant." CFMA § 102, 114 Stat. at ___, *codified at* 7 U.S.C.A. § 2(B)(ii) (West Supp. 2001). Among those not eligible to be contract participants are persons with less than $10 million in total assets (or $5 million, if the purpose of the transaction is to manage risk rather than to speculate on movements in price), and who are not registered as futures or securities professionals. CFMA § 102, 114 Stat. at ___, codified at 7 U.S.C.A. § 1a(12) (West Supp. 2001). There is no question that trades entered into by Noble Wealth meet this test. Although a legislative enactment is not an authoritative guide to the meaning of previous legislation, we do note that our approach here is consistent with that taken by its recent effort to "clarify the jurisdiction" of the Commission in the CFMA.

In sum, we reject Baragosh's principal challenge to the Commission's jurisdiction over Noble Wealth's trades and hold that Congress did empower the Commission to regulate those transactions.[3] Accordingly, the district court did not err in imposing a civil penalty of $1,211,058 on Baragosh, three times the salary and commissions that he received from Noble Wealth, for his individual violations of the Act while employed by Noble Wealth. Nor did the court err in issuing injunctions against him. *See* 7 U.S.C.A. § 13a-1 (West 1999).

### III.

Alternatively, Baragosh contends that the district court erred in holding as a matter of law that he was a controlling person of Noble

---

[3]Baragosh additionally challenges the Commission's jurisdiction on the ground that Noble Wealth transactions were spot contracts and the CEA governs only futures contracts. We reject this argument for the reasons ably set forth by the district court. *See Noble Wealth*, 90 F. Supp. 2d at 688.

Wealth, and therefore liable for more than five million dollars in restitution arising from the company's violations of the CEA.

The CEA provides now, as it did during all periods relevant to this litigation, that an individual who "directly or indirectly" controls a corporation that has violated the CEA "may be held liable for such violation in any action brought by the Commission to the same extent as such controlled [corporation]." 7 U.S.C.A. § 13c(b) (West 1999); 7 U.S.C.A. § 1a(16) (West 1999) (currently at 7 U.S.C.A. § 1a(28) (West Supp. 2001)). For liability to attach, the Commission must prove: (1) that a corporation violated the Act; (2) that the defendant "directly or indirectly" controlled that corporation; and (3) that the controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C.A. § 13c(b).

Baragosh does not dispute that Noble Wealth violated the CEA or that he had at least constructive knowledge of Noble Wealth's violations. *See JCC, Inc. v. CFTC*, 63 F.3d 1557, 1568 (11th Cir. 1995) (noting that constructive knowledge sufficient for a finding of knowing inducement). The first and third elements of controlling person liability are therefore established. Baragosh maintains, however, that a question of fact remains as to whether the Commission has proved the second element — that he directly or indirectly controlled Noble Wealth.

To establish that a defendant controlled a corporation for purposes of § 13c(b), the Commission must show that the defendant "actually exercised general control over the operation of the entity principally liable" *and* "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993) (quoting *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1138 (7th Cir. 1992), and interpreting *In re Spiegel*, No. 85-19, 1988 WL 232212 (C.F.T.C. Jan. 12, 1988);[4]

---

[4]The district court stated this test in abbreviated form; a fuller account would have been clearer. Citing *Monieson* and *Spiegel*, the district court noted that "[m]erely possessing the authority to direct policy suffices to

*see also In re Johns*, No. 01-22, 2001 WL 951733 at \*3 (C.F.T.C. Aug. 21, 2001) (same). Whether a defendant had such control depends on all the facts and circumstances: an officer or director may not "control" a corporation for purposes of this section, *see CFTC v. Avco Fin. Corp.*, 28 F. Supp. 2d 104, 114, 117 (S.D.N.Y. 1998), *opinion modified by CFTC v. Avco Financial Corp.*, 1998 WL 524901 (S.D.N.Y. Aug 21, 1998), and *aff'd in part rev'd in part on other grounds by CFTC v. Vartuli*, 228 F.3d 94 (2nd Cir. 2000) (researcher with title of "vice president," who helped produce software used in fraud, was not controlling person), while a non-officer family member may control the corporation. *See In re Apache Trading Corp.*, No. 87-14, 1992 WL 52596 at \*1-2, 5 (C.F.T.C. Mar. 11, 1992). Because control may be exercised jointly by a group, several persons may simultaneously be controlling persons of the same corporation. *JCC, Inc.*, 63 F.3d at 1557 (three controlling persons in fraudulent solicitation scheme).

But, in every case, "the controlling person must have *actually* exercised general control over the operation of the entity principally liable." *Monieson*, 996 F.2d at 859 (internal quotation and citation omitted) (emphasis added). Thus, controlling person liability reaches those who actually direct a corporation or cause it to act, but would otherwise hide behind formalities of ownership or title. *See Apache Trading Corp.*, 1992 WL 52596 at \*5 (C.F.T.C.). For those lower down the corporate ladder, the Act provides a different form of secondary liability, aiding and abetting liability under 7 U.S.C. § 13c(a). The Commission's choice of a charge determines its evidentiary burden and the scope of relief if the charge is proved. Here, the Commission charged Baragosh only as a controlling person of Noble Wealth, not as an aider and abetter of the company.

The undisputed evidence in the record undoubtedly demonstrates that Baragosh was a key employee in Noble Wealth who knew of the

---

meet the standard; a controlling person need actually not exercise that authority to be found liable under Section 13(b)." *Noble Wealth*, 90 F. Supp. 2d at 691. In fact, as *Monieson* makes clear, the Commission can establish controlling person authority *only* by making the two-part showing described above and *supra*.

company's fraud and enthusiastically furthered it. Baragosh testified that he "overs[aw]" the corporation's trading operations in Maryland and Georgia. He placed ads in newspapers to recruit traders; plied traders with fraudulent brochures and sales scripts; walked Noble Wealth's trading floors exhorting traders to "trade, trade, trade." Baragosh was also indisputably a signatory on several Noble Wealth bank accounts and wrote checks to pay operating expenses, commissions, and personal expenses. He appeared on the company's behalf at an arbitration hearing, and, at some point, received the title of vice president. The day before the Commission raided Noble Wealth, he signed a lease on the company's behalf.

But there is also evidence — particularly Baragosh's testimony — that others had tight control over all important decisions at Noble Wealth and afforded him no meaningful discretion. Baragosh testified that he did not record trades or keep trading accounts; he did not set commission rates or trading fees; he could not open or close customer accounts; and he could not hire or fire employees. According to Baragosh, he wrote checks only when his superior, Nawab Khan, was not on the premises, and then only pursuant to Khan's express instructions. Indeed, Baragosh maintained that his "oversight" was not "managing" so much as "just . . . taking orders." He testified that Nawab Khan called two or three times each day to hear reports and give instructions, and that Nawab then conferred with his brother Murad. According to Baragosh, the two brothers made all the important decisions. For example, Baragosh testified, without contradiction, that the Khans decided to expand the company from Los Angeles to Atlanta and Maryland, and only later told him about their decision.

The present evidentiary record provides some circumstantial corroboration for Baragosh's account of his role. It is undisputed, for example, that the Khans did not hire Baragosh until after they had established Noble Wealth in Los Angeles. And although Baragosh was later given the title "vice president," corporate documents in the record give no indication that he was an officer or director of Noble Wealth, or owned stock or had any voting rights in the company. Nor is there evidence that Baragosh received a pay increase to accompany his "promotion" to vice president, or that he was authorized to hire, fire or discipline any Noble Wealth employees. Rather, Baragosh testified (and the Commission has not disputed) that the Noble Wealth

dealers who actually placed calls to Hong Kong and kept the trading records in the Maryland office, were hired by the Khans and answerable to them.

Given this record, we cannot agree with the district court that the uncontroverted material facts establish that Baragosh controlled Noble Wealth for purposes of 7 U.S.C. § 13c(b). Crediting Baragosh's testimony and giving him the benefit of every reasonable inference, as we must at this juncture, the facts as to whether he "exercised general control" over Noble Wealth's operations, *Monieson*, 996 F.2d at 859 (internal quotation and citation omitted) (emphasis added), and so was a controlling person for purposes of § 13c(b), are very much in dispute.

It is useful to compare the present record to cases where defendants have been held controlling persons of a company or scheme under the Act. In most such cases, defendants have exercised nearly complete authority. *See, e.g.*, *In re Arnold*, No. 97-12, 2000 WL 1146371 (C.F.T.C. Aug. 14, 2000) (Arnold was "the sole principal and shareholder of [the company]"); *In re Kim*, No. 00-24, 2000 WL 873545 (C.F.T.C. June 29, 2000) (Kim "was the President of [the company] and the sole person responsible for the day-to-day operations of [the company]"); *In re Slusser*, No. 94-14, 1999 WL 507574 (C.F.T.C. July 19, 1999) ("Slusser was sole owner, treasurer and chairman of the board of [the company], ran the organization, and had the ultimate say-so . . . and was the signatory authority on most, if not all of [the company's contracts].") (internal quotations and citation omitted).

Of course, a defendant need not exercise such undiluted authority to qualify as a controlling person of a company, but we have found *no* case where control is based solely on facts similar to those now uncontroverted as to Baragosh. Indeed, in at least one recent enforcement proceeding, a manager whose position was strikingly similar to that which Baragosh claims for himself was neither charged with control of a fraud scheme nor found to be in control. *See In re Global Currencies Ltd.*, No. 97-13, 2000 WL 136068 (C.F.T.C. Feb. 14, 2000).

The Commission nevertheless suggests that controlling person liability may attach simply because a defendant is extensively involved

in training, and cites *JCC, Inc.*, 63 F.3d at 1567-70, in support. But in that case, the defendant whose controlling person authority was litigated had not only trained personnel, but also served as the CEO and president of the commodities trading firm, and had "personally hired many of [the firm's associated persons], established their pay and benefits, and covertly monitored their sales solicitation efforts." *Id.* at 1568. In addition, the defendant had "required [them] to utilize sales scripts . . . taught [them] to read the scripts verbatim . . . wrote some of these scripts, and . . . reviewed and approved all [the scripts]." *Id.*; *see also In re JCC, Inc.*, No. 89-4, 1991 WL 272672 (C.F.T.C. Dec. 13, 1991) (discussing operation in greater detail). In contrast, Baragosh contends that he did not hire, fire, set employees' salaries, write scripts, or serve as president.

Nor, contrary to the Commission's contention, was Baragosh's appearance at an arbitration hearing on behalf of Noble Wealth unambiguous evidence that he controlled the company. At that hearing, Baragosh testified mainly about the nature of foreign currency trading and the mechanics of Noble Wealth's trading operation, giving out the same information that he regularly supplied as a "trainer." He stated that his position as vice president was "just kind of a nomination that they give to me" as a "good gesture from the company." Indeed, he testified that he was not even an employee of Noble Wealth, but rather an "independent contractor" who took instructions from Nawab Khan. We note that, at the time of the arbitration proceeding, the Commission had not yet filed its complaint and Baragosh lacked any apparent incentive to downplay his authority.

For these reasons, we vacate the district court's grant of summary judgment to the Commission on the issue of whether Baragosh was a controlling person of Noble Wealth. Of course, this does not mean that the Commission will be unable to prove Baragosh is a controlling person, only that at this juncture the undisputed facts do not establish this. On remand, factual disputes may be resolved against Baragosh and, upon review of all relevant evidence and after making the necessary credibility determinations, the fact finder may conclude that Baragosh was indeed a controlling person of Noble Wealth.[5] We also

---

[5]If Baragosh is found to be a controlling person, the fact finder must also determine when he attained that status. Under controlling person

vacate and remand the district court's holding that Baragosh bucketed orders in violation of 7 U.S.C. § 6b (a)(iv) and its order directing Baragosh to pay restitution to Noble Wealth customers. Both of these rulings depend on the district court's conclusion that Baragosh was a controlling person of Noble Wealth and should be reconsidered in light of the court's ultimate holding on that question.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART AND VACATED AND REMANDED IN PART.*

WILLIAMS, Circuit Judge, concurring in part and concurring in the judgment:

I concur in Parts I, III and IV of Judge Motz's opinion, and concur in the result with respect to Part II. I write separately because I believe that the language of the CEA itself, read in the most natural manner, authorizes the CFTC to regulate the transactions at issue in this case. Because the legislative history does not clearly suggest that transactions such as the ones at issue in this case were meant to be exempted from CFTC jurisdiction, there is no need to address a potential conflict between text and legislative history. I therefore concur in the result reached by Part II of the majority opinion.

---

provisions in federal securities law, which are persuasive authority for interpreting 7 U.S.C. § 13c(b), *see Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986), controlling person liability attaches only to acts committed by the primary actor during a period of control. *See Brown v. Enstar Group, Inc.*, 84 F.3d 393, 397 (11th Cir. 1996); Louis Loss and Joel Seligman, *Securities Regulation* 4472 (3d ed. 1992). We see no reason to vary that principle in applying the CEA.